STATE OF NORTH CAROLINA v. RUBEN WRIGHT, JR.

No. COA06-1435

(Filed 3 July 2007)

**1. Venue— motion for change—pretrial publicity**

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion for change of venue due to pretrial publicity, because: (1) defendant did not renew his

**STATE v. WRIGHT**

[184 N.C. App. 464 (2007)]

motion for change of venue after it was first denied by the trial court, and the trial court stated it would reconsider its decision should defendant choose to raise the issue again; (2) defendant has not shown any prejudice that would have required the trial judge to change venue; and (3) defendant was unable to show that any jurors were unable to render a verdict consistent with the evidence presented at trial.

## 2. Confessions and Incriminating Statements— motion to suppress—defendant not in custody

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion to suppress a statement given to a sheriff on 14 January 2006 while defendant was inside Camp Lejeune's brig, because: (1) the trial court's findings of fact support its legal conclusions that defendant was not in custody during his discussion with the sheriff; (2) defendant was brought into an interview room without handcuffs and shackles; (3) the sheriff informed defendant that he had not come to interview him and that if he asked him a question, do not answer; and (4) defendant was free to leave the interview room at any time and return to the brig.

Judge JACKSON concurring in a separate opinion.

Appeal by defendant from judgment entered 20 January 2006 by Judge Charles H. Henry in Onslow County Superior Court. Heard in the Court of Appeals 23 May 2007.

*Attorney General Roy Cooper, by Special Deputy Attorney General Tiare B. Smiley, for the State.*

*James R. Parish, for defendant.*

LEVINSON, Judge.

Defendant (Ruben Wright, Jr.) appeals judgment entered upon his conviction for the first degree murder of James Taulbee (Taulbee). We find no error.

The relevant facts may be summarized as follows: At 7:46 p.m. on 5 January 2004, Holly Ridge Police Officer Keith Whaley responded to a 911 call of a shooting at 107 Chestnut Court. At the scene, Whaley observed several people on the sidewalk, including the deceased's wife, Zenaida Taulbee (Zene), who was crying. On the second floor of 107 Chestnut Court, Whaley discovered Taulbee in the master bed-

room, lying in a bed surrounded with blood. Taulbee was shot twice in the face.

Whaley further observed that the doorjamb on the front door was broken and was laying face up to the right of the door, and that the nails facing up were unbent. A computer keyboard lay just inside the doorway. When Officers David Neuman, Thomas Robinson and Patrick Garvey investigated the scene, the back door was unlocked and nothing appeared to be missing. During a search of a Taulbee's Pontiac Grand Am, a cell phone was discovered under the driver's seat. Robinson turned the phone on and the display indicated that the phone belonged to Zene. As Robinson was holding the phone, a call came in from "Gunner, 329-2982[,]" and then "Gunner, 340-2353." A U.S. Cellular official testified that defendant purchased the phone on 26 October 2002 and secured his account with the password "Zene." Review of the Zene cell phone records revealed numerous calls and voice mails from "Gunner." The messages were eventually accessed, recorded, and transcribed.

Barbara Ann Marsh testified that, on 5 January 2004, she rose at 4:15 a.m. for work. At that time, Marsh observed the headlights of a vehicle shining into her bedroom window. She thought it was "out of the ordinary" because the earliest she recalled neighbors leaving in the morning was closer to 5:00 a.m. Shortly thereafter, she heard two noises—"a muted thuddy kind of noise"—from the direction of the Taulbees' house.

On 12 January 2004, defendant was ordered to return early from his military training in California. On 13 January 2004, Sheriff Colonel Mark Shivers interviewed defendant. Defendant told Shiver that he knew Taulbee and that Zene was "just a friend." Defendant said he believed Zene killed her husband. Later during the same interview, however, defendant admitted an affair with Zene, and to meeting her frequently at a Burger King restaurant and at a military barracks. He said he called Zene the morning of the murder, but did not go to the residence. During the interview, defendant stated, "if I were smart I would give up [Zene] Taulbee and the other person." He stated he did not talk Zene into killing her husband and that a white person killed the victim. Defendant admitted calling Zene the night of 5 January at 6:30, 7:00 and 10:30, and also at 12:30 a.m. on 6 January 2004. After a message on the cell phone was played for defendant, he stated, "I guess I'm going down, but I didn't pull the trigger."

Defendant was also interviewed by Naval Criminal Investigative Service (NCIS) Officer Scott Vousboukis on 15 January 2004. De-

fendant told Vousboukis that he had known Zene since August 2002 from a Burger King restaurant. When his relationship with Zene became sexual, he purchased a cell phone for Zene so he could call her during the day without raising her husband's suspicions. The two would work out at 4:45 a.m. each day, then shower and occasionally have sex at a barrack's room assigned to a friend who was attending training school. Zene told him her husband was physically abusive. Defendant also stated that, on 5 January, he and Zene met at the gym at the usual time to work out, and that he later spent most of the day working and preparing to leave for California. He remained at his residence until 1:30 a.m. He did not "plan to initiate or execute the plan to kill" Taulbee.

Based on an earlier request by defendant to see Sheriff Brown, Brown and Detective T. J. Cavanagh met defendant at the brig on 16 January 2004. Defendant was being held on charges of wrongful disposition of military property, larceny and wrongful appropriation, conduct unbecoming an officer and gentleman, and adultery. According to Cavanagh, defendant did not appear tired or impaired. While the sheriff was explaining some of the facts of the case and defendant's known involvement, defendant suddenly jumped up and stated, "I did not shoot him. Zene shot him and all [I] did was reload the gun." He repeated, "I did not shoot him; she shot him." He then said, "I shouldn't have said that" and sat back down. Cavanagh further testified that defendant stated that Zene told him that she "wanted her husband dead."

Zene testified. When she returned from the Phillippines in December 2003, defendant told her that Randy Linniman was making a silencer gun that Linniman was going to use to get rid of defendant's wife. She met defendant on 5 January 2004; defendant told her that he was leaving for California and asked her to meet him the next morning at the gym at 4:20 a.m. He told her that he had picked up a gun Linniman "made for him" that afternoon and on Monday morning he and Linniman would be at her house. If she saw them, Zene explained, she was to simply drive away.

The following day Zene awoke at 3:45 a.m. and left the house at approximately 4:20 a.m.; her husband remained in their bed. As she was getting in her car, she saw Linniman's car approach. The car went to the end of the cul-de-sac, and then turned around and parked beside her house. Zene observed a white arm sticking out of the driver side window. As she pulled out of the driveway, Zene saw

defendant get out of the car. He was wearing black spandex-type pants and a black shirt. He quickly walked toward her house.

She arrived at the gym at 4:30 a.m. and worked out. Defendant's car was in the parking lot, but she did not find him inside. Sometime after 5:00 a.m., defendant appeared and began his usual workout. Zene asked defendant why he was at her house that morning. Defendant responded, "don't worry about it[,]" and explained that Linniman gave him a ride to the gym. Defendant next took a shower and later sat next to Zene on a couch. He told her it was going to be a "good year" for them. Zene asked him again why he was at her house; defendant said, "we missed it." He told Zene to call her husband. Zene tried five or six times that day to call her husband, but he did not answer. Defendant called her three or four times that day. Each time she asked him what had happened. First defendant said he did not want to talk about it and that they would take care of the problem later. During one of the calls, defendant put Linniman on the phone. Zene did not normally talk to Linniman on the phone. Defendant also came to the back of the Burger King to see Zene that day. He told her, "you've got nothing to worry about no more[,]" and that they "took care of the problem." Defendant told her to "expect. the worst" when she got home. When Zene arrived home in the early evening, the doors were open and a keyboard was in the driveway. The door was broken in and all the lights were turned off. She discovered her deceased husband upstairs.

A jury convicted defendant of first degree murder. Defendant now appeals.

[1] In his first argument, defendant contends that the trial court erred by denying his motion for change of venue due to pre-trial publicity. Defendant argues that he did not receive a fair trial consistent with the Fifth Amendment to the United States Constitution and Article I of the North Carolina Constitution. We disagree.

N.C. Gen. Stat. § 15A-957 (2005) provides, in pertinent part, that:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or

(2) Order a special venire under the terms of G.S. 15A-958.

In applying Section 15A-957, the Supreme Court has stated:

> The test for determining whether pretrial publicity mandates a change of venue is whether it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed. Defendant has the burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial in that county on account of prejudice from such pretrial publicity. To meet this burden defendant must show that jurors have prior knowledge concerning the case, that he exhausted peremptory challenges and that a juror objectionable to the defendant sat on the jury. In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial.

> The determination of whether a defendant has carried his burden of showing that pretrial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion.

> Only in the most extraordinary cases can an appellate court determine solely upon evidence adduced prior to the actual commencement of jury selection that a trial court has abused its discretion by denying a motion for change of venue due to existing prejudice against the defendant. The existence of pretrial publicity by itself does not establish a reasonable likelihood that defendant cannot receive a fair trial in the county where the crime was committed.

*State v. Knight*, 340 N.C. 531, 553-54, 459 S.E.2d 481, 495 (1995) (internal citations and quotation marks omitted); *see also State v. Burmeister*, 131 N.C. App. 190, 194, 506 S.E.2d 278, 280-81 (1998).

As a preliminary matter, we observe that defendant did not renew his motion for change of venue after it was first denied by the trial court. In addition, the record reflects that, in rendering his decision to deny the pretrial motion to change venue, the trial court stated he would reconsider his decision should defendant choose to raise the issue again. Here, defendant has not shown any prejudice that would have required the trial court judge to change venue. While the record

on appeal contains copies of local news articles regarding this matter, the record does not include a transcript of the jury selection. As a result, defendant has been unable to show that any jurors were unable to render a verdict consistent with the evidence presented at trial. *See Knight*, 340 N.C. at 554, 459 S.E.2d at 495 (no prejudice where defendant "made no showing that any of the prospective jurors in Forsyth County would be unable to set aside this pretrial publicity and decide the case solely on the evidence presented at trial"). On this record, defendant has not shown that the trial court abused its discretion in denying the motion to change venue. This assignment of error is overruled.

[2] Defendant next argues that the trial court erred by denying his motion to suppress a statement given to Onslow County Sheriff Ed Brown on 14 January 2006 while he was inside Camp LeJeuene's brig. He contends that his statement was obtained in violation of his right against self-incrimination under the Fifth Amendment to the U.S. Constitution and Article I of the North Carolina Constitution. We disagree.

It is well settled that Miranda warnings are only required when a person is being subjected to custodial interrogation. *State v. Patterson*, 146 N.C. App. 113, 121, 552 S.E.2d 246, 253 (2001) (citations omitted). "Custodial interrogation" was defined by the United States Supreme Court in Miranda as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966). In *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (1997), the North Carolina Supreme Court summarized the law regarding the application of Miranda in custodial interrogations and stated that "in determining whether a suspect [is] in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." An individual who is incarcerated is not:

> automatically in custody for the purposes of *Miranda*; rather, whether an inmate is in custody must be determined by considering his freedom to depart from the place of his interrogation. We recognize, however, that an inmate inherently has some restriction on his freedom of movement, and factors to consider when determining whether an inmate is free to depart from the place of his interrogation include whether: the inmate was free to refuse

to go to the place of the interrogation, the inmate was told that participation in the interrogation was voluntary and that he was free to leave at any time, the inmate was physically restrained from leaving the place of interrogation, and the inmate was free to refuse to answer questions.

*State v. Briggs*, 137 N.C. App. 125, 129, 526 S.E.2d 678, 680-81 (2000). Additionally, " 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980).

In the present case, defendant has not assigned error to any of the trial court's findings of fact. The findings are therefore binding on appeal. *See State v. Jacobs*, 162 N.C. App. 251, 254, 590 S.E.2d 437, 440 (2004). We are therefore left to determine only whether the trial court's findings support its legal conclusions, which are fully reviewable on appeal. *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

The trial court, found in pertinent part, that:

15. Sheriff Brown would have made arrangements the next day to see the defendant at the sheriff's office, but he did not see him. He had Detective Cavanagh, a retired marine, make the arrangements with the brig to speak to the defendant. The sheriff was accompanied by Detective Cavanagh when he went to the brig to speak to the defendant at the brig around 1 p.m. on January 16, 2004. The defendant was escorted by a guard to a room that contained a table and chairs and a couch with room enough for two people. The defendant sat on the couch with the sheriff while Cavanagh sat at the table. Sheriff Brown made it clear to the defendant that he was not there to interrogate or interview him but to visit and advise him, in as much detail as he could, as to the status of the investigation. He advised the defendant that he did not want to question him and told him directly that "if I do ask a question, do not answer." The defendant was not advised of any Miranda rights, and the sheriff did not anticipate that the defendant would make any statements. The defendant was not in custody for, and had not been charged with, any civilian offenses related to the murder. The defendant was not restrained in any way. The sheriff felt that they were sitting down as friends who

shared a common religious faith. The defendant was not com-
pelled to speak to the sheriff and was free to refuse to say any-
thing and leave the room at any time.

16. During the interview on January 13, 2004 at the sheriff's
office, the defendant indicated that he was "close to the fire, but
he was not the one that did the act." In the conference room at
the brig, the sheriff told the defendant, in as much detail as he
could, the status of the investigation. He told the defendant that
he was implicated at the house that early morning and that they
knew about his relationship with Zenaida Taulbee. At some time
during the conversation, the defendant unexpectedly jumped up
from the couch and said that Zenaida Taulbee killed her husband
and he had only reloaded the gun for her. Afterwards, the defend-
ant remarked that he should not have said that. Their conversa-
tion also went into the religious aspects of this situation. The
sheriff and the defendant spoke in the brig for about one hour.

17. During the period of time the defendant was in the room with
the sheriff and detective Cavanagh, no promises, offers of
reward, or inducements were made to the defendant to make a
statement nor were there any threats, suggested violence or show
of violence made. The defendant never expressed a desire to stop
talking nor was there any indication that he desired to stop talk-
ing. The defendant never made a request for a lawyer, either civil-
ian or military. There is no evidence that the defendant was con-
fused, did not understand his situation, was under the influence
of any drugs or narcotics, or was in any ill health.

Based upon these findings, the trial court concluded in relevant
part that:

1. Although the defendant was incarcerated for charged viola-
tions of the Uniform Code of Military Justice, the defendant was
free to leave the room, where he had been escorted, to return to
his cell and free not to talk to law enforcement officers. A prison
inmate is not "automatically always in 'custody' within the mean-
ing of *Miranda*." *United States v. Conley*, 779 F.2d 970, 973 (4th
Cir. 1985). The Supreme Court has held that "notwithstanding a
'coercive environment,' there is no custody for *Miranda* pur-
poses unless the questioning takes place 'in a context where [the
questioned person's] freedom to depart [is] restricted. . . [.]"
*Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50
L. Ed. 2d 714 (1977). "In determining whether a suspect [is] in

custody, an appellate court must examine all the circumstances surrounding the interrogations; but the definitive inquiry is whether there was a formal arrest or a restraint in freedom of movement of the degree associated with a formal arrest." *State.v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405[,] *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). Even though there was a change in the defendant's location within the brig, he still had the ability to leave the conference room and to not speak to Sheriff Brown. The defendant was not in custody for the purposes of *Miranda*. *State v. Briggs*, 137 N.C. App. 125, 526 S.E.2d 678 (2000).

. . . .

4. None of the defendant's constitutional rights, either Federal or State, were violated when he gave his oral statement to Sheriff Brown in the brig.

In the instant case, we conclude that the trial court's findings of fact support its legal conclusions that defendant was not in custody during his discussion with Sheriff Brown inside Camp Lejeune's brig. Defendant was brought into an interview room without handcuffs and shackles. Brown informed defendant that he had not come to interview him and that "if I do ask a question, do not answer." And defendant was free to leave the interview room at any time and return to the brig. *See State v. Fisher*, 158 N.C. App. 133, 146-47, 580 S.E.2d 405, 415-16 (2003) (defendant inmate not in custody for purposes of Miranda where he was at all times free not to talk and return to his cell). Because defendant was not in custody for the purposes of Miranda, we need not address whether he was subject to an interrogation. This assignment of error is overruled.

No error.

Judge McGEE concurs.

Judge JACKSON concurs with separate opinion.

JACKSON, Judge concurring.

I concur fully with the majority. However, assuming *arguendo* that defendant was in custody at the time of his conversation with Onslow County Sheriff Ed Brown, he had been given his *Miranda* warnings twice in the prior four days. Defendant first was read his *Miranda* rights upon arriving at the sheriff's office on the night of 12

January 2004, and he was again advised of his rights on 15 January 2004 prior to being interviewed by the NCIS agents at their office. Therefore, even if it was error for the trial court to admit defendant's statements to Sheriff Brown, any error was harmless as defendant had been adequately Mirandized.