STROUD, Judge.
*603 Tae Kwon Hammonds ("defendant") appeals from a judgment entered after a jury found him guilty of robbery with a dangerous weapon. Defendant argues that the trial court erred in (1) denying defendant's motion to suppress statements made to police officers while he was involuntarily committed; and (2) ordering that defendant pay $50 in restitution. We find no error in part, vacate in part, and remand.
*604 I. Background
The following evidence was presented by the State at trial: At approximately 8:30 p.m. on 10 December 2012, Stephanie Gaddy was walking to her car in a Wal-Mart parking lot in Monroe when she noticed three men and a woman leaning against a vehicle about ten parking spaces away. She was about to get into her vehicle when she was approached from behind by a man who said "give me the money" and demanded her purse. Ms. Gaddy noticed that the man was carrying a handgun and realized she was being robbed. The man took her purse and cellphone. At trial, she described the perpetrator as an African-American male with a deep voice but did not identify defendant or any other individual as the perpetrator.
The next day, on 11 December 2012, defendant attempted suicide by taking an overdose of "white pills" and was brought to Carolinas *362 Medical Center Union Hospital ("CMC Union"). At 3:50 p.m., while defendant was being treated at the hospital, a Union County magistrate ordered that defendant be involuntarily committed. Defendant was placed under 24-hour watch, during which a "sitter" was required to continuously observe him and accompany him when he left his room. That night, defendant became agitated and attempted to leave the hospital but was escorted back to his room by hospital security.
At approximately 5:00 p.m. the next day, on 12 December 2012, Detective Jonathan Williams and Lieutenant T.J. Goforth arrived at the hospital to speak with defendant about the robbery of Ms. Gaddy. The police asked Nurse Jan Kinsella, defendant's attending nurse at the time, if they could speak with defendant, which she allowed. The police officers interviewed defendant in his hospital room for approximately one and a half hours and did not inform defendant of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During the interview, defendant confessed to the robbery, though he denied using a gun.
On or about 4 February 2013, a grand jury indicted defendant for robbery with a dangerous weapon. See N.C. Gen.Stat. § 14-87 (2011). On or about 30 June 2014, defendant moved to suppress the statements he made during the police interview on the grounds that he was subjected to a custodial interrogation without having been given Miranda warnings, and that his confession was involuntary. The trial court denied defendant's motion to suppress and admitted an audio recording of the interview at trial. The trial court later memorialized its findings of fact *605 and conclusions of law in a written order. On 2 July 2014, the jury found defendant guilty of robbery with a dangerous weapon. The trial court sentenced defendant to 60 to 84 months' imprisonment and ordered that defendant pay $50 in restitution. Defendant gave notice of appeal in open court.
II. Motion to Suppress
Defendant argues that the trial court erred in denying his motion to suppress because (1) he was "in custody" for purposes of Miranda and did not receive the Miranda warnings; and (2) his confession was involuntary.
A. Standard of Review
The standard of review in determining whether a trial court properly denied a motion to suppress is whether the trial court's findings of fact are supported by the evidence and whether its conclusions of law are, in turn, supported by those findings of fact. The trial court's findings are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. The determination of whether a defendant's statements are voluntary and admissible is a question of law and is fully reviewable on appeal.
State v. Cortes-Serrano, 195 N.C.App. 644, 654-55, 673 S.E.2d 756, 762-63 (citations and quotation marks omitted), disc. review denied, 363 N.C. 376, 679 S.E.2d 138 (2009). "Additionally, the trial court's determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law, which is fully reviewable on appeal." State v. Buchanan, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001).
B. Findings of Fact
Defendant's brief recounts much of the evidence from the hearing on the motion to suppress and notes some findings that the trial court could have made but did not. But our standard of review as to the findings of fact does not allow us to substitute our judgment for that of the trial court; the trial court determines the weight and credibility of the evidence. And this order includes full and detailed findings of fact, so we need not speculate about the basis for the trial court's ruling. Defendant ultimately challenges only small portions of three of the trial court's Findings of Fact 2, 6, and 13 as unsupported or at least partially unsupported by the evidence.
*606 Finding of Fact 2 states as follows:
That on December 11th, 2012, at approximately 3:50 p.m., Magistrate Sherry Crowder, a Union County Magistrate, issued a custody order for the involuntary commitment of [defendant], and directed the Union County Sheriff's Department to deliver [defendant] to a facility for examination *363 and treatment. That the paper writing introduced into evidence showed that the magistrate found that the defendant was mentally ill and dangerous to himself or others; and the Sheriff's Department was directed to serve such paper writing on the defendant and transport the defendant.
Defendant argues that Finding of Fact 2 was "partially unsupported by the evidence, as the court found that the involuntary commitment order directed the Union County Sheriff's Department to deliver [defendant] to a facility [for] treatment." (Emphasis added.) Defendant is correct that the involuntary commitment order, issued in Union County, directs "any law enforcement officer " to "take [defendant] into custody within 24 hours after this order is signed and transport [defendant] directly to a 24-hour facility designated by the State for the custody and treatment of involuntary clients and present [defendant] for custody, examination and treatment pending a district court hearing." (Emphasis added and portion of original in all caps.) The evidence also showed that a law enforcement officer from the Union County Sheriff's Office executed this order. The exact wording of Finding of Fact 2 is not strictly supported by the record, but defendant has not demonstrated how the wording of the finding is prejudicial to him, and the substance of the facts is supported by the record. This argument is without merit.
Defendant also argues that Finding of Fact 13, "that nurses were in and out of the room during the interview and that [defendant] 'was never isolated without the ability to contact others,' was unsupported by the evidence." (Quoting Finding of Fact 13.) Finding of Fact 13 in its entirety is as follows:
The defendant was interviewed by Detective Williams of the Monroe Police Department and Detective T.J. Goforth at approximately five p.m. on December the 12th. They spoke with the defendant for approximately one and [a] half hours. No Miranda Rights were given to the defendant. On at least three occasions, however, the defendant was told that, "there were no arrest warrants *607 with the officers," and that they were not here to "lock you up." Indeed the defendant was not arrested and there were no warrants present at the time they spoke with the defendant. It is clear from the conversation that the officers had with the defendant that they knew that he was hospitalized as a result of an overdose, whether accidental or intentional, and had been involuntarily committed, and would be going for further evaluation and treatment. But although the defendant's words seem to be muttered, especially initially, they were appropriate responses to the statements or questions from the officers. The defendant answered the questions or statements coherently and appropriately. Throughout the conversation the defendant never asked the officers to leave or to stop talking. There was actually a sitter watching the interview, and nurses were in and out. The defendant was never isolated without the ability to contact others. The tone was conversational between the officers and the defendant, although the officers would confront the defendant when they believed that he was being less than truthful. The officers did not tell the defendant he was being taped. There is no indication that there had been any previous relationship between the defendant and the officers. The nurse was not an agent of the state [or] government. The defendant was not arrested and no warrant issued at the time. The defendant was unable to leave the hospital. He was not actually at a police station and was not told that he could not stop the conversation or request that the officers leave. He was never threatened, voices were never raised. The only promises made were such that the officers would tell the [district attorney] about his cooperation, and that he would be in a superior position to others if he told, before others did, as to the facts of the circumstances of the incident at Wal-Mart.
(Emphasis added.)
As noted above, only the underlined portion of this finding is challenged by defendant as unsupported by the evidence. Defendant's argument relies heavily upon the *364 hospital records and notations of times that nurses recorded activities in defendant's room, stressing periods of time when a nurse was not physically present in the room. Yet we also note that defendant has not challenged Finding of Fact 8, which states:
*608 During the defendant's stay in the hospital and before he spoke with Monroe Police Department, he visited with representatives of DayMark, who apparently was the provider for his inpatient or outpatient follow-up from the hospital. He also had others around, specifically his mother, at times during his time in the hospital.
The trial court's characterization of the nurses as being "in and out" of the room is fully supported by the medical records, Nurse Kinsella's testimony, and the transcript of the audio recording of the police interview. The trial court did not need to prepare a detailed log of every moment that each person who visited or treated defendant was in the room. There is no indication in the evidence that defendant was ever isolated or prevented from contacting others, and Finding of Fact 8, which is unchallenged, also addresses his contact with others. This argument is also without merit.
Defendant also challenges Finding of Fact 6, specifically that defendant was "normal." Defendant asserts that the trial court found that he was normal simply because "he scored a 15 on the Glascow Coma Scale, as the scale does not assess a patient's psychiatric or mental state. An alert and conscious patient who says, 'I want to walk now to London, England,' scores 15 on the Glascow Coma Scale." (Citation omitted.) Defendant's argument takes the word "normal" entirely out of context. In context, the relevant portion of Finding of Fact 6 addresses Nurse Kinsella's testimony and states that
according to her review, a Glascow-Coma Scale was administered when the defendant had arrived at the [emergency room], which is a quick and objective way to determine a patient's physical and mental state. It includes such criteria as the ability of keeping eyes open, whether oriented and can converse, obey commands, vocalize pain. That the defendant registered a fifteen on the Glascow-Coma Scale, (even on admission) and that is termed "normal".
This finding is fully supported by the evidence, and it is not, as defendant implies, a finding that defendant's mental state upon his admission to the emergency room after a suicide attempt and involuntary commitment was entirely "normal." The trial court was addressing defendant's state of consciousness upon arrival at the emergency room, and in other findings the trial court addresses defendant's mental and emotional state, both upon arrival and after treatment, in detail. Defendant does not challenge those findings as unsupported by the evidence.
*609 The trial court's findings of fact which were not challenged on appeal are binding on this court on appeal, and the challenged findings were supported by the record, so all of the trial court's findings of fact are binding on appeal. See State v. Phillips, 151 N.C.App. 185, 190-91, 565 S.E.2d 697, 701 (2002) ; State v. Jackson, 308 N.C. 549, 581, 304 S.E.2d 134, 152 (1983).
C. Custody
i. Automatic Custody
Defendant's argument suggests that a defendant who has been involuntarily committed in the hospital is automatically "in custody" for purposes of Miranda warnings. The briefs from both defendant and the State focus on cases which have addressed interrogations in hospital settings where a defendant was voluntarily seeking medical care, while defendant here was in the hospital due to involuntary commitment. The dissent also distinguishes the cases dealing with hospitalized defendants because they deal with persons voluntarily in the hospital for treatment and would require the trial court to apply a new and different analysis to the questioning of an involuntarily committed person. We agree that involuntary commitment is different from a voluntary hospitalization, as there is no doubt that involuntary commitment places a person in custody and his freedom of movement may be restricted by law enforcement officers. But we believe that cases dealing with incarcerated defendants who have been questioned regarding other crimes *365 unrelated to their current imprisonment are instructive on this issue, and our courts have simply not considered the fact that the defendant is incarcerated as determinative. Since involuntary commitment is arguably less restrictive than incarceration, and certainly not more restrictive, we do not adopt a more restrictive rule for involuntary commitment than for incarceration.
In determining whether defendant was "in custody" for purposes of Miranda, this situation is closely analogous to cases which address interviews of a prisoner who has been incarcerated for another crime, when law enforcement officers attempt to speak with him about another entirely separate crime. In State v. Fisher, this Court held that an inmate is not "automatically in custody for the purposes of Miranda [,]" and our Supreme Court affirmed this ruling per curiam. 158 N.C.App. 133, 145, 580 S.E.2d 405, 415 (2003), aff'd per curiam, 358 N.C. 215, 593 S.E.2d 583 (2004). There, we noted:
It is well established that Miranda warnings are required only when a defendant is subjected to custodial *610 interrogation. Because the determination of whether a defendant was in custody is a question of law, it is fully reviewable here.
A person is in custody, for purposes of Miranda, when he is taken into custody or otherwise deprived of his freedom of action in any significant way, and an inmate who is subject to a custodial interrogation is entitled to Miranda warnings. An inmate, however, is not, because of his incarceration, automatically in custody for the purposes of Miranda; rather, whether an inmate is in custody must be determined by considering his freedom to depart from the place of his interrogation.
Factors which bear on the determination of whether an inmate is in custody for purposes of Miranda include: (1) whether the inmate was free to refuse to go to the place of the interrogation; (2) whether the inmate was told that participation in the interrogation was voluntary and that he was free to leave at any time; (3) whether the inmate was physically restrained from leaving the place of interrogation; and (4) whether the inmate was free to refuse to answer questions.
Id., 580 S.E.2d at 415 (citations, quotation marks, and brackets omitted).
This Court has followed this rule in State v. Briggs, 137 N.C.App. 125, 129, 526 S.E.2d 678, 680-81 (2000), and State v. Wright, 184 N.C.App. 464, 470-71, 646 S.E.2d 625, 629 (2007), cert. denied, 362 N.C. 372, 662 S.E.2d 393 (2008). In addition, the Fourth Circuit Court of Appeals agrees:
[ Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968),] clearly holds that the fact that a defendant is imprisoned on an unrelated matter does not necessarily remove the necessity for Miranda warnings. Nothing in that opinion, however, suggests that an inmate is automatically "in custody" and therefore entitled to Miranda warnings, merely by virtue of his prisoner status....
We also decline to read Mathis as compelling the use of Miranda warnings prior to all prisoner interrogations and hold that a prison inmate is not automatically always in "custody" within the meaning of Miranda. [The *611 defendant's] view of the Mathis decision would seriously disrupt prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad informal conversations between inmates and prison guards which may touch on past or future criminal activity and which may yield potentially incriminating statements useful at trial. As the Ninth Circuit pointed out, this approach would "torture [Miranda ] to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." [ Cervantes v. Walker, 589 F.2d 424, 427 (9th Cir.1978).] Such a result would be directly at odds with established constitutional doctrine that while persons in government-imposed confinement retain various rights secured by the Bill of Rights, they retain them in forms qualified by the exigencies of prison administration and the special governmental interests that result. See Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (qualified sixth amendment rights of inmates in prison disciplinary *366 proceedings); Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (qualified fifth amendment liberty interest of pre-trial detainee); Hudson v. Palmer, [468 U.S. 517], 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (qualified fourth amendment right of inmates).
....
Prisoner interrogation simply does not lend itself easily to analysis under the traditional formulations of the Miranda rule. A rational inmate will always accurately perceive that his ultimate freedom of movement is absolutely restrained and that he is never at liberty to leave an interview conducted by prison or other government officials. Evaluation of prisoner interrogations in traditional freedom-to-depart terms would be tantamount to a per se finding of "custody," a result we refuse to read into the Mathis decision.
United States v. Conley, 779 F.2d 970, 972-73 (4th Cir.1985), cert. denied, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986) (third alteration in original).
A person who has been involuntarily committed is certainly a "person[ ] in government-imposed confinement[,]" just as an incarcerated defendant, and the exigencies of the administration of hospitals and *612 inpatient facilities which treat patients with psychiatric conditions are quite similar to those of prisons. See id. at 973. For example, if every involuntarily committed person held in an emergency room, hospital, or other mental health treatment facility is automatically "in custody" for purposes of Miranda, a law enforcement officer who simply needs to ask a patient for information about an altercation or theft which had occurred in the facility would have to first notify the person of his Miranda rights, regardless of the other circumstances of the interview. Such a result is "directly at odds with established constitutional doctrine that while persons in government-imposed confinement retain various rights secured by the Bill of Rights, they retain them in forms qualified by the exigencies of prison administration and the special governmental interests that result." See id. For these reasons, we hold that defendant was not automatically "in custody" for purposes of Miranda based simply upon his involuntary commitment and instead we consider the circumstances of defendant's statements in the same manner as courts have considered interviews of incarcerated defendants.
ii. Totality of the Circumstances
In light of the above discussion, we must address whether the trial court's findings of fact support its conclusion of law that, based on the totality of the circumstances, defendant was not "in custody" for purposes of Miranda. Generally, "the appropriate inquiry in determining whether a defendant is 'in custody' for purposes of Miranda is, based on the totality of the circumstances, whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Buchanan, 353 N.C. at 339, 543 S.E.2d at 828 (emphasis added and quotation marks omitted). In the context of a hospitalized defendant, this Court examines "(1) whether the defendant was free to go at his pleasure; (2) whether the defendant was coherent in thought and speech, and not under the influence of drugs or alcohol; and (3) whether officers intended to arrest the defendant." State v. Allen, 200 N.C.App. 709, 714, 684 S.E.2d 526, 530 (2009). "This Court has also made a distinction between questioning that is accusatory and that which is investigatory." Id., 684 S.E.2d at 530. In Allen, this Court held that the defendant was not "in custody" and noted that "[a]ny restraint in movement [the] defendant may have experienced at the hospital was due to his medical treatment and not the actions of the police officers." Id. at 715, 684 S.E.2d at 531.
In United States v. Jamison, the Fourth Circuit Court of Appeals also stressed this distinction:
*613 Analysis of whether [the defendant] was in custody ... depends on whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter[.] In dissecting the perceptions of such a reasonable person, however, we must be careful to separate the restrictions on his freedom arising from police interrogation and those incident *367 to his background circumstances. That is, to the extent [the defendant] felt constrained by his injuries, the medical exigencies they created (e.g., the donning of a hospital gown and the insertion of an I.V. line), or the routine police investigation they initiated, such limitations on his freedom should not factor into our reasonable-person analysis. It is this careful differentiation between police-imposed restraint and circumstantial restraint that leads us to conclude that [the defendant] was not in custody[.]
U.S. v. Jamison, 509 F.3d 623, 629 (4th Cir.2007) (citation, quotation marks, and brackets omitted).
In the context of a prison inmate, this Court examines "(1) whether the inmate was free to refuse to go to the place of the interrogation; (2) whether the inmate was told that participation in the interrogation was voluntary and that he was free to leave at any time; (3) whether the inmate was physically restrained from leaving the place of interrogation; and (4) whether the inmate was free to refuse to answer questions." Fisher, 158 N.C.App. at 145, 580 S.E.2d at 415 (quotation marks omitted). In Conley, the Fourth Circuit Court of Appeals, in determining whether a prison inmate was "in custody," examined the "circumstances of the interrogation to determine whether the inmate was subject to more than the usual restraint on a prisoner's liberty to depart." Conley, 779 F.2d at 973 (emphasis added).
In addressing the issue of custody, we apply an objective test:
Throughout the years, the United States Supreme Court has stressed that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Unless they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus *614 cannot affect the Miranda custody inquiry. Nor can an officer's knowledge or beliefs bear upon the custody issue unless they are conveyed, by word or deed, to the individual being questioned. A policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.
Buchanan, 353 N.C. at 341-42, 543 S.E.2d at 829 (emphasis added and citations and quotation marks omitted).
Here, the trial court made Finding of Fact 13, as quoted above. During the interview, the police officers told defendant that he was not being arrested and in fact did not arrest him. The officers never told defendant that he could not stop the conversation or that he could not request that they leave, and the officers never threatened defendant or raised their voices. Defendant was "never isolated without the ability to contact others[,]" a sitter watched the interview, and nurses were "in and out" during the interview. Given that the factors in Allen or Fisher do not squarely apply to the context of an involuntarily committed defendant, we focus on "how a reasonable man in [defendant's] position would have understood his situation." See Buchanan, 353 N.C. at 341-42, 543 S.E.2d at 829. While the dissent is correct that defendant was not free to leave the hospital, "we must be careful to separate the restrictions on his freedom arising from police interrogation and those incident to his background circumstances." See Jamison, 509 F.3d at 629. In other words, we must analyze how a reasonable person, in defendant's position, would have perceived the purpose of the restriction on his movement, whether it be for police interrogation or for medical treatment.
On 11 December 2012, the night before the police approached defendant, defendant "tried to leave the room, but was escorted back by security." Given the fact that defendant's attempt to escape took place before the police interview, coupled with the attendant circumstances of the interview, as discussed above, we hold that a reasonable person in defendant's position would understand that the restriction on his movement was due to *368 his involuntary commitment to receive medical treatment, not police interrogation. See Allen, 200 N.C.App. at 715, 684 S.E.2d at 531 (holding that the defendant was not "in custody" and noting that "[a]ny restraint in movement [the] defendant may have experienced at the hospital was due to his medical treatment and not the actions of the police officers"). Additionally, the test in Conley accords with this result, as defendant was not subject to "more than the usual restraint[.]" See Conley, 779 F.2d at 973. *615 The dissent correctly cites N.C. Gen.Stat. § 122C-205(a), for the proposition that if an involuntarily committed patient of a 24-hour facility escapes, the responsible professional shall immediately notify law enforcement. See N.C. Gen.Stat. § 122C-205(a) (2011). But a prison inmate who attempts to escape prison would also be met with police resistance, and yet as discussed above, numerous courts have held that a prison inmate is not automatically "in custody" for purposes of Miranda. We hold that the purpose behind a defendant's restraint is much more relevant than the force that can potentially be summoned to thwart a breach of that restraint. In light of Buchanan, Allen, Conley, and Jamison, we agree with the trial court that defendant was not "in custody" for purposes of Miranda. The trial court properly considered all of the factors to determine if defendant was in custody and did not err in its conclusion of law that based on the totality of the circumstances, defendant was not in custody at the time he was interviewed.
D. Voluntariness
Defendant next challenges the trial court's conclusion of law that his statements during the police interview were voluntary. Under the United States Constitution, the question is whether the totality of the circumstances demonstrates that the statement was "the product of an essentially free and unconstrained choice by its maker[.]" Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057 (1961) ; see also State v. Bordeaux, 207 N.C.App. 645, 647, 701 S.E.2d 272, 274 (2010). In considering whether a statement was voluntary, the court must assess "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973). We consider the following factors:
whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.
Cortes-Serrano, 195 N.C.App. at 655, 673 S.E.2d at 763. "Admonitions by officers to a suspect to tell the truth, standing alone, do not render a confession inadmissible.... [To be improper, an] inducement of hope must promise relief from the criminal charge to which the confession *616 relates." State v. McCullers, 341 N.C. 19, 27, 460 S.E.2d 163, 168 (1995). In State v. Smith, a police officer testified that he told the defendant during an interrogation: "I couldn't tell him what would happened [sic], but it will be better for him when he came to court that he would tell-that we would tell the [district attorney] and the judge that he told the truth about it." 328 N.C. 99, 115, 400 S.E.2d 712, 720-21 (1991) (first alteration in original and brackets omitted). Our Supreme Court held that this statement did not constitute an improper promise and that the defendant's confession was voluntary. Id. at 115, 118, 400 S.E.2d at 721-22.
As relevant to defendant's argument regarding voluntariness, the trial court found as follows:
9. That Nurse [Kinsella] checked the defendant for fall risk, that he was alert; he was not confused, he was oriented, he had a quick "get up and go", and he could respond quickly to moving out of the bed, and had no medications to make him confused at the time that she saw him.
10. That he was actually discharged from the care of the emergency room at 21:00 hours on 12-12. That he had to be medically stable for such to occur. That *369 he actually clothed himself to leave before he actually left.
11. That when the nurse went off duty, she noted that the defendant's vital signs were within normal limits, his behavior was calm, he had proper emotional support; she had gone over the coping skills with him, and they were effective. She had discussed his concerns and suicide precautions were still in place. Nurse [Kinsella] had been on duty approximately two hours when two detectives arrived from the Monroe Police Department. They checked with her before they went to the defendant's room, and she told them that he was alert, oriented, and they were welcome to talk with him. She did not ask the defendant if he wished to speak with them, and did not tell the officers why the defendant was there, although it is clear from the conversation that they were aware that he was actually involuntarily committed at that time.
....
13. The defendant was interviewed by Detective Williams of the Monroe Police Department and Detective *617 T.J. Goforth at approximately five p.m. on December the 12th. They spoke with the defendant for approximately one and [a] half hours. No Miranda Rights were given to the defendant. On at least three occasions, however, the defendant was told that, "there were no arrest warrants with the officers," and that they were not here to "lock you up." Indeed the defendant was not arrested and there were no warrants present at the time they spoke with the defendant. It is clear from the conversation that the officers had with the defendant that they knew that he was hospitalized as a result of an overdose, whether accidental or intentional, and had been involuntarily committed, and would be going for further evaluation and treatment. But although the defendant's words seem to be muttered, especially initially, they were appropriate responses to the statements or questions from the officers. The defendant answered the questions or statements coherently and appropriately. Throughout the conversation the defendant never asked the officers to leave or to stop talking. There was actually a sitter watching the interview, and nurses were in and out. The defendant was never isolated without the ability to contact others. The tone was conversational between the officers and the defendant, although the officers would confront the defendant when they believed that he was being less than truthful. The officers did not tell the defendant he was being taped. There is no indication that there had been any previous relationship between the defendant and the officers. The nurse was not an agent of the state [or] government. The defendant was not arrested and no warrant issued at the time. The defendant was unable to leave the hospital. He was not actually at a police station and was not told that he could not stop the conversation or request that the officers leave. He was never threatened, voices were never raised. The only promises made were such that the officers would tell the [district attorney] about his cooperation, and that he would be in a superior position to others if he told, before others did, as to the facts of the circumstances of the incident at Wal-Mart.
14. At the time of the interview the defendant had had no drugs administered by the hospital in more than fourteen hours. The Court has had a chance to review *618 the witnesses and listen to the tape, and finds the defendant to be at all times coherent and understanding of the questions, and appropriately responsive in his answers. There appears nothing from the Court listening to the tape that indicates the defendant was under the influence of any medication, and certainly not under the influence of medications that would cause him to be incapable of understanding the context or words that were coming to him and issued by him. The defendant was coherent in thought and speech and not under the influence of drugs or alcohol at the time the statement was made.
The trial court concluded: "Based on the totality of the circumstances, the Court finds the defendant made a knowing, voluntary, and understanding statement to the officers[.]"
*370 The trial court's findings of fact addressed the obvious concerns raised by the evidence in this case. Defendant had been involuntarily committed and had attempted a drug overdose. The trial court's extensive findings of fact, only a portion of which are quoted above, demonstrate that the court carefully considered all of the circumstances and defendant's mental and emotional state. In addition, there was an audio recording of the interview, which the trial court reviewed and was able to hear both the officers' questions and defendant's responses and demeanor. A trial court, and this Court, should exercise a high degree of care to ensure that the rights of a person in defendant's condition, who has been involuntarily committed and may suffer from an impairing mental or emotional condition, are protected. But the trial court did exactly that in this case.
Defendant also contends that his confession was not voluntary because the police officers made threats, promises, and accusations of lying. But we are bound by the findings the trial court actually made, as they are either unchallenged or supported by the evidence. See Phillips, 151 N.C.App. at 190-91, 565 S.E.2d at 701 ; Jackson, 308 N.C. at 581, 304 S.E.2d at 152. The trial court found that "the officers would confront the defendant when they believed that he was being less than truthful." The trial court also found that the police officers never threatened defendant and promised only that they "would tell the [district attorney] about his cooperation, and that he would be in a superior position to others if he told, before others did, as to the facts of the circumstances of the incident at Wal-Mart." The police officers' exhortations that defendant tell the truth did not render defendant's confession involuntary. See McCullers, 341 N.C. at 27, 460 S.E.2d at 168. Additionally, the police officers' promise *619 that they would tell the district attorney about defendant's cooperation and that he would be in a " superior position to others" was not improper and did not vitiate the voluntariness of defendant's confession. See id., 460 S.E.2d at 168 ; Smith, 328 N.C. at 115, 118, 400 S.E.2d at 721-22 ; State v. Richardson, 316 N.C. 594, 603-04, 342 S.E.2d 823, 830-31 (1986) (holding that a detective's statement to the defendant that "the district attorney usually responds favorably when a defendant cooperates" did not render the defendant's confession involuntary).
Defendant's reliance on State v. Pruitt, where our Supreme Court held that the defendant's confession was involuntary, is misplaced. See 286 N.C. 442, 458, 212 S.E.2d 92, 102-03 (1975). There,
the interrogation of defendant by three police officers took place in a police-dominated atmosphere. Against this background the officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was "lying" and that they did not want to "fool around." Under these circumstances one can infer that the language used by the officers tended to provoke fright. This language was then tempered by statements that the officers considered defendant the type of person "that such a thing would prey heavily upon" and that he would be "relieved to get it off his chest." This somewhat flattering language was capped by the statement that "it would simply be harder on him if he didn't go ahead and cooperate." Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate, i.e., confess.
Id., 212 S.E.2d at 102. In contrast, here, the "tone was conversational between the officers and the defendant, although the officers would confront the defendant when they believed that he was being less than truthful." Accordingly, we distinguish Pruitt.
Defendant's reliance on State v. Flood, where this Court held that a police officer made an improper promise, is similarly misplaced. See ---N.C.App. ----, ----, 765 S.E.2d 65, 72 (2014), disc. review denied, - -- N.C. ----, 768 S.E.2d 854 (2015). There,
[d]uring the interview, Agent Oaks suggested she would work with and help Defendant if he confessed and that she "would recommend that defendant get treatment" instead of jail time. She also asserted that Detective Schwab "can *620 ask *371 for, you know, leniency, give you this, do this. He can ask the District Attorney's Office for certain things. It's totally up to them what they do with that but they're going to look for recommendations." Agent Oaks further suggested to Defendant that
if you admit to what happened here Detective Schwab is going to probably talk to the District Attorney and say, "hey, this is my recommendation. Hey, this guy was honest with us. This guy has done everything we've asked him to do. What can we do?" and talk about it.
At one point, Agent Oaks asked Defendant directly: "Do you want my help?" Agent Oaks also threatened that any possibility of help from her or Detective Schwab would cease after their conversation with Defendant ended, once even after Defendant asked to speak to his mother on the phone.
Id. at ----, 765 S.E.2d at 72 (brackets and ellipses omitted). In contrast, here, the police officers never threatened defendant and promised only that they "would tell the [district attorney] about his cooperation, and that he would be in a superior position to others if he told, before others did, as to the facts of the circumstances of the incident at Wal-Mart." Accordingly, we also distinguish Flood and hold that the trial court's findings of fact support its conclusion of law that defendant's confession was voluntary.[1]
III. Restitution
Defendant's last argument is that the trial court erred in ordering defendant to pay $50 in restitution because Ms. Gaddy did not testify regarding the value of her identity card or medications, which defendant had stolen and had not been returned to her. The State agrees with defendant but argues that the appropriate remedy is to remand the case to the trial court for further consideration.
*621 A. Standard of Review
Although defendant failed to object to this issue, we hold that this issue is preserved for appellate review. See N.C. Gen.Stat. § 15A-1446(d)(18) (2013) ; State v. Mumford, 364 N.C. 394, 402-03, 699 S.E.2d 911, 917 (2010). "[W]e review de novo whether the restitution order was supported by evidence adduced at trial or at sentencing." State v. Wright, 212 N.C.App. 640, 645, 711 S.E.2d 797, 801 (quotation marks omitted), disc. review denied, 365 N.C. 351, 717 S.E.2d 743 (2011).
B. Analysis
[T]he amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing....
Prior case law reveals two general approaches: (1) when there is no evidence, documentary or testimonial, to support the award, the award will be vacated, and (2) when there is specific testimony or documentation to support the award, the award will not be disturbed.
State v. Moore, 365 N.C. 283, 285, 715 S.E.2d 847, 849 (2011). In Moore, our Supreme Court articulated a third approach for cases that fall in the middle ground. Id. at 285-86, 715 S.E.2d at 849-50. The Court held that "some evidence" supported an award of restitution but that the evidence was not specific enough to support the amount of the award. Id. at 286, 715 S.E.2d at 849. The Court remanded the case to the trial court for a new hearing to determine the appropriate amount of restitution. Id., 715 S.E.2d at 849-50. Because there is some evidence to support an award of restitution but the evidence is not specific enough to support the amount of the award, we vacate the restitution order and remand for a new hearing to determine the appropriate amount of restitution. See id., 715 S.E.2d at 849-50.
IV. Conclusion
For the reasons noted above, we hold that the trial court committed no error during the guilt-innocence phase, vacate the restitution order, and remand the case for a new hearing *372 to determine the appropriate amount of restitution.
NO ERROR IN PART, VACATED IN PART, AND REMANDED.
Judge MCCULLOUGH concurs.
Judge INMAN dissents.

We also note that this Court in Flood held that the defendant's confession was voluntary despite its conclusion that Agent Oaks made an improper promise. Id. at ----, 765 S.E.2d at 74.