INMAN, Judge, dissenting.
*622 I must respectfully dissent to the majority's decision that defendant's statement to police was noncustodial because, in my view, the circumstances of a person who has been involuntarily committed require inquiry and analysis beyond that performed by the trial court here.
The issue of whether and in what circumstances police questioning of an involuntarily committed person is custodial is one of first impression in North Carolina. While I agree with the majority that the nature of involuntary commitment does not render police questioning custodial per se, the analysis employed by North Carolina's appellate courts in other settings does not address the circumstances of a person who has been placed in custody involuntarily, who has not been charged with any crime, and whose mental condition merits inpatient treatment. It is incumbent upon trial courts in such cases to apply the factors identified by this Court and the North Carolina Supreme Court in other settings and to consider additional factors that are not at issue in other settings and have not previously been addressed by these courts. The additional factors include whether the involuntarily committed person expressly consented to the police interview and whether the person was told he was free to exit the interview area or to ask the officers to leave his presence.
I acknowledge that the trial court's findings of fact with regard to a motion to suppress are conclusive on appeal if supported by any competent evidence, and I agree that defendant has not managed to refute the few findings he challenged based on this standard of review. I disagree, however, with the majority's review of the trial court's determination of whether defendant was in custody when he was questioned, a conclusion of law fully reviewable on appeal. In my view, the trial court erred by applying a legal analysis inconsistent with this Court's precedent in other settings and by failing to weigh other factors necessary to determine whether police questioning of an involuntarily committed person was custodial.
The facts here-many of them found by the trial court-demonstrate the shortcomings in the analysis and conclusion that defendant was not in custody when questioned. Defendant was confronted without warning by two police detectives in the room where he was confined against his will. Neither the detectives nor any medical provider asked *623 defendant to consent to an interview. The detectives did not introduce themselves to defendant at the beginning of the interview. Detective Williams simply began questioning defendant about his condition and the circumstances leading to his hospitalization. It appears from the evidence that defendant had no place to retreat to if he wished to avoid questioning, although the trial court made no finding in this regard. It is also unclear whether defendant was free to leave his bed during police questioning; at the end of the interview Detective Goforth offered to swap out an old tray of food from defendant's bedside with a tray elsewhere in the room, "and put the fresh one where you can reach it." The trial court made no finding in this regard.
The circumstances of an involuntarily committed person are not the same as those of a typical hospital patient. In the hospital cases cited by the majority, the defendant was in a medical facility on his own volition, not legally restrained in any way. See, e.g., State v. Allen, 200 N.C.App. 709, 715, 684 S.E.2d 526, 531 (2009) (the defendant was not in custody where his restraint of movement was due to medical treatment for a cut); United States v. Jamison, 509 F.3d 623, 633 (4th Cir.2007) ("Absent police-imposed restraint, there is no custody.").
I also disagree with the majority that cases addressing questioning of prison and jail inmates are so closely analogous as to obviate the need for additional inquiry where the person subject to questioning has been involuntarily committed. Unlike prison and jail *373 inmates, who necessarily have been advised of their Miranda rights in the course of their prior arrests, and who often have had the benefit of counsel in the course of their criminal cases, involuntarily committed patients may have had no prior occasion to be so advised or even to think about their rights if approached by police.
Involuntary commitment, as set out in our General Statutes, is a physical detention executed by government actors against the will of an individual. The General Assembly unequivocally describes involuntary commitment as the taking of a person into "custody." See N.C. Gen.Stat. § 122C-252 (2013) (describing facilities to be utilized for "the custody and treatment of involuntary clients"); N.C. Gen.Stat. § 122C-261 (2013) (specifying that the purpose of an involuntary commitment order is "to take the respondent into custody for examination by a physician or eligible psychologist"). Indeed, the order by which the Union County magistrate committed defendant was titled "Custody Order."
The Custody Order served on defendant in this case specified that, after taking defendant into custody, the law enforcement officer was *624 required to inform him that he "[was] not under arrest and has not committed a crime, but is being transported to receive treatment and for his or her own safety and that of others." The required disclaimer belies the similarity between a formal arrest and the taking of an individual into custody for the purposes of involuntary commitment, a comparison this Court has recognized before. In In re Zollicoffer, we reasoned that:
[T]he requirements for a custody order under N.C. Gen.Stat. § 122C-261 are analogous to those where a criminal suspect is subject to loss of liberty through the issuance of a warrant for arrest. In both instances a magistrate or other approved official must find probable cause (though under N.C. Gen.Stat. § 122C-261 the synonymous term reasonable grounds is used) supporting the issuance of the order or warrant. In both cases the magistrate has the power to deprive a person of his liberty pending a more thorough and demanding determination of the evidence against him.
165 N.C.App. 462, 466, 598 S.E.2d 696, 699 (2004) ; see also In re Moore, --- N.C.App. ----, ----, 758 S.E.2d 33, 36 (2014) ("We have drawn [a comparison between involuntary commitment and arrest] because a custody order deprives a person of their liberty and therefore is analogous to a criminal proceeding, like the issuance of an arrest warrant, where a defendant is deprived of his liberty.").
The General Assembly also has recognized that both a formal arrest and involuntary commitment feature substantial loss of liberty, because indigent persons subject to either are constitutionally entitled to appointed counsel. See N.C. Gen.Stat. § 7A-451(a)(1), (6) (2013) ; see also McBride v. McBride, 334 N.C. 124, 126, 431 S.E.2d 14, 16 (1993) ("[I]n determining whether due process requires the appointment of counsel for an indigent litigant in a particular proceeding, a court must first focus on the potential curtailment of the indigent's personal liberty[.]").
Many of the findings entered by the trial court in this case reflect the similarity between a formal arrest and an involuntary commitment custody order. The trial court noted that Custody Order directed "any law enforcement officer" to take defendant into custody and transport him to a 24-hour health facility. When defendant tried to leave the hospital on the night of 11 December, he was escorted back to his room by a uniformed security officer. The trial court found as an uncontested fact that "[defendant] was unable to leave the hospital." Any 24-hour facility *625 that accepts involuntarily committed clients is required to immediately notify the appropriate law enforcement agency if any such patient leaves the premises, and that law enforcement agency is in turn required to take the client into custody and remit him to the 24-hour facility from which he "escaped." See N.C. Gen.Stat. § 122C-205(a) (2013).
Assuming arguendo that the cases involving police questioning of inmates, relied upon by the majority, were sufficient to apply in this case, they do not support the trial court's conclusion in this case. This Court in State *374 v. Fisher held that "whether an inmate is in custody must be determined by considering his freedom to depart from the place of his interrogation." 158 N.C.App. 133, 145, 580 S.E.2d 405, 415 (2003) aff'd, 358 N.C. 215, 593 S.E.2d 583 (2004). In contrast, defendant was not free to leave his hospital room.
Fisher's further holding, which is quoted by the majority and bears repeating, requires the trial court to consider the following specific factors: "(1) whether the [involuntarily committed person] was free to refuse to go to the place of the interrogation; (2) whether the [person] was told that participation in the interrogation was voluntary and that he was free to leave at any time; (3) whether the [person] was physically restrained from leaving the place of interrogation; and (4) whether the [person] was free to refuse to answer questions." Id. (citations and quotation marks omitted). The first two factors, applied to the trial court's findings in this case, suggest that defendant was in custody: he was not free to refuse to go to the place of the interrogation and he was not told that his participation was voluntary or that he was free to leave. The trial court's findings do not reflect consideration of the third and fourth factors.
Although the trial court found that defendant "was not told that he could not stop the conversation or request that the officers leave," the double negative reveals an attenuated approach to the facts and misstates the second factor provided in Fisher. It appears undisputed that the police detectives did not tell defendant that he could stop the conversation or that he could ask the officers to leave.
After entering defendant's room and asking about his health condition, detectives first asked defendant about thefts from lockers at his workplace, unrelated to the charges and convictions on appeal here. After defendant denied any involvement, the detectives told him that they were being "lenient" by coming to him without an arrest warrant and that "unless you tell us the truth, then we have to do what we have to do.... Because we already know. It's just that we want to hear it from *626 you." After demonstrating to defendant that he could not avoid culpability by his denials because of their superior knowledge, police detectives then questioned defendant about the robbery of Ms. Gaddy underlying the charges and convictions at issue in this appeal. Detective Goforth repeated her forecast of the consequences without his cooperation: "But the thing is is that, like I said, I mean, that man right there [Detective Williams] needs a warrant. He's already got everything he needs. It's a done deal." The nature of the police detectives' statements to defendant, no matter how softly spoken or conversational in tone, and notwithstanding their assurances that he would not be arrested there on the spot, would seem to suggest to any reasonable person that police already had enough information to bring charges but were giving him a chance to cooperate in hopes of mitigating his exposure. In my view, a reasonable person in defendant's position presented with this information from two police officers at his bedside would hardly consider the conversation an informal one. The trial court's findings of fact did not address these circumstances.
Unlike the defendant in Fisher, defendant expressed no consent to speak with police officers and in fact had no warning that they were coming to question him. The officers simply asked the nurse monitoring defendant for permission to enter the room, which she granted without seeking defendant's consent. While the issue has not previously been addressed in North Carolina, courts in other jurisdictions considering police questioning involuntarily committed patients have noted such factors as central to the custody analysis. Compare United States v. Hallford, No. 13-0335(RJL), 103 F.Supp.3d 1, 1-2, 2015 WL 2128680, at *3 (D.D.C. May 6, 2015) (where defendant, who was questioned in his hospital gown, was not asked if he would submit to an interview and was never told he could refuse to answer questions or suspend the interview at any time, "any reasonable person would have believed that he was not free to leave or terminate the interview") with State v. Rogers, 848 N.W.2d 257, 263-64 (N.D.2014) ("The medical staff did not permit the detectives to speak with Rogers until the staff had his permission. Hospital staff also *375 selected the room where the interview was conducted [outside of the defendant's hospital room].").
Nor were the circumstances of defendant's statements to police analogous to the statements at issue in Fisher and decisions following its holding. The defendant in Fisher was not sought out by police; he asked to leave his prison cell and met with a guard to confess he had committed a murder years earlier because "he realized he was getting away with murder and it started eating him up inside[.]"
*627 158 N.C.App. at 138, 580 S.E.2d at 410 (quotation marks and brackets omitted). The defendant in State v. Briggs was exiting an interview room when he stopped at the open door, closed the door, returned to sit with the officer and confessed to a crime. 137 N.C.App. 125, 127, 526 S.E.2d 678, 679 (2000). The defendant in State v. Wright unexpectedly told officers that he had participated in a fatal shooting, even though one officer had expressly told defendant that the purpose of their meeting was not to interrogate him, was only to advise him of the status of the case, and that " 'if I do ask a question, do not answer.' " 184 N.C.App. 464, 471, 646 S.E.2d 625, 630 (2007).
Defendant's circumstances in this case-like those of most involuntarily committed mental patients-also differed from the prison environment cited by the majority, supra, in which federal courts have reasoned that requiring Miranda warnings in all prisoner interrogations "would seriously disrupt prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad informal conversations between inmates and prison guards." United States v. Conley, 779 F.2d 970, 973 (4th Cir.1985). A mental patient's constitutional rights should not be "qualified by the exigencies of prison administration and the special governmental interests that result." Id.
The trial court made no finding regarding whether there was a formal arrest or restraint on defendant's freedom of movement of the degree associated with a formal arrest. Nor did the trial court make a finding regarding whether a reasonable person in defendant's circumstances would not have felt free to terminate the interview or to ask the officers to leave his room.
The fact noted by the majority that defendant was involuntarily committed based on actions bearing no relation to the criminal activity that officers questioned him about did not, in my view, diminish his constitutional rights with regard to interrogation. Such an approach would leave involuntarily committed patients vulnerable to visits from law enforcement officers seeking information they would be less likely to obtain in another setting. Courts must not place such risk on a population which by definition is comprised of people suspected of not being able to care for themselves.
It is important to note that the trial court may not have been presented with the case law cited or the legal analysis included in this dissent. The extensive findings of fact reflect that the trial court indeed exercised a high degree of care in its decision. Nonetheless, in my view the decision was in error.
*628 In light of the additional factors which I believe must be weighed-whether defendant expressly consented to speak with police and whether defendant was told that he could ask officers to leave his presence-along with other factors previously delineated by this Court as necessary to determining whether a statement is custodial, I would reverse the trial court's order denying defendant's motion to suppress and remand this case for reconsideration of the motion and the entry of findings and conclusions based upon all pertinent factors. Because one factor to be considered in determining whether a statement was voluntary is whether defendant was in custody when questioned, the trial court's conclusion regarding custody also could require it to reconsider the issue of whether defendant's statement was voluntary.