IN THE SUPREME COURT OF NORTH CAROLINA

No. 389A15-2

Filed 29 September 2017

STATE OF NORTH CAROLINA

v.

TAE KWON HAMMONDS


On review pursuant to order of this Court entered on 10 June 2016 following oral argument on 18 May 2016 in session in the Old Burke County Courthouse in the City of Morganton pursuant to N.C.G.S. § 7A-10(a), in which the Court vacated the opinion of the Court of Appeals in *State v. Hammonds*, ___ N.C. App. ___, 777 S.E.2d 359 (2015), vacated an order denying defendant's motion to suppress entered on 24 July 2014 by Judge Tanya T. Wallace in Superior Court, Union County, and certified the case to the trial court for a new hearing and entry of a new order on defendant's motion to suppress. *State v. Hammonds*, 368 N.C. 906, 789 S.E.2d 1 (2016). The Court ordered the parties to submit supplemental briefs after certification of the new order to this Court. Issues raised in the supplemental briefs heard on 13 June 2017.

*Joshua H. Stein, Attorney General, by Joseph E. Elder, Assistant Attorney General, for the State.*

*Glenn Gerding, Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender, for defendant-appellant.*

HUDSON, Justice.

Here we are asked to decide whether the trial court properly concluded that defendant was not subjected to a custodial interrogation as defined in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), when police questioned him while he was confined under a civil commitment order. After considering the totality of the circumstances, we conclude that defendant was in custody for *Miranda* purposes. Therefore, the failure of police to advise him of his rights under *Miranda* rendered inadmissible the incriminating statements he made during the interrogation. Accordingly, we reverse the trial court's order denying his motion to suppress those statements. Because this error was prejudicial, we vacate defendant's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of 10 December 2012 in Monroe, North Carolina, a man stole Stephanie Gaddy's purse in a parking lot while threatening her with a handgun. Shortly after 1:00 p.m. on 11 December 2012, Defendant Tae Kwon Hammonds was taken to the emergency room at a local hospital following an intentional overdose. An involuntary commitment order was issued at 3:50 p.m. upon a finding by a Union County magistrate that defendant was "mentally ill and dangerous to self or others." As directed in the order, the Union County Sheriff's Office took defendant into custody at 4:32 p.m. that same day.

After using surveillance footage to identify defendant as a suspect in the robbery, investigators learned that he was confined at the hospital under the involuntary commitment order. In the early evening of 12 December, while defendant was hospitalized under that order, he was questioned by Detective Jonathan Williams and his supervisor, Lieutenant T.J. Goforth, both of the Monroe Police Department, for about an hour and a half. Without informing him of his *Miranda* rights, the officers elicited self-incriminating statements from defendant during the interview. Defendant was discharged from the hospital later that evening and transported to a treatment facility.

On 4 February 2013, the Union County Grand Jury indicted defendant for robbery with a dangerous weapon. On 30 June 2014, defendant moved to suppress all statements he made to police during the 12 December 2012 interview. In support of his motion, defendant asserted that (1) he was in custody when the statements were taken and was not informed of his *Miranda* rights at that time, and (2) even if he was not in custody, his statements were not made voluntarily.

Defendant was tried during the criminal session of Superior Court, Union County, that began on 30 June 2014 before Judge Tanya T. Wallace. After hearing defendant's motion to suppress, the trial court denied the motion on 1 July 2014. The court also denied defendant's motion to dismiss at the close of the State's evidence. A jury convicted defendant as charged, and the court sentenced him to sixty to eighty-

four months of imprisonment. The court also ordered defendant to pay, *inter alia*, fifty dollars in restitution to the victim. On 24 July 2014, the court entered a written order on the motion to suppress in which it made findings of fact and conclusions of law.

Defendant appealed to the Court of Appeals, which on 20 October 2015 issued a divided opinion that found no error in the guilt-innocence portion of defendant's trial but vacated the portion of the trial court's judgment ordering defendant to pay restitution to the victim and remanded the case for a new hearing on that issue. *State v. Hammonds*, ___ N.C. App. ___, ___, 777 S.E.2d 359, 371-72 (2015). Regarding defendant's challenge to the trial court's denial of his suppression motion, the majority (1) concluded that "the trial court properly considered all of the factors to determine if defendant was in custody and did not err in its conclusion of law that based on the totality of the circumstances, defendant was not in custody at the time he was interviewed," and (2) held that "the trial court's findings of fact support its conclusion of law that defendant's confession was voluntary." *Id.* at ___, ___, 777 S.E.2d at 368, 371.

The dissenting judge, however, concluded that the trial court's findings of fact did not reflect consideration of whether defendant "was physically restrained from leaving the place of interrogation" or whether he "was free to refuse to answer questions." *Id.* at ___, 777 S.E.2d at 374 (Inman, J., dissenting) (quoting *State v.*

*Fisher*, 158 N.C. App. 133, 145, 580 S.E.2d 405, 415 (2003), *aff'd per curiam*, 358 N.C. 215, 593 S.E.2d 583 (2004)).  The dissenting judge stated that she would reverse the trial court's denial of defendant's motion to suppress and remand "for reconsideration of the motion and the entry of findings and conclusions based upon all pertinent factors."  *Id.* at ___, 777 S.E.2d at 375.  Defendant filed his appeal of right, and on 28 January 2016 this Court allowed defendant's petition for discretionary review to consider additional issues.

On 9 June 2016, this Court vacated the opinion of the Court of Appeals and the trial court's orders denying defendant's motion to suppress, and we instructed the trial court to hold a new hearing on the motion to suppress.  *State v. Hammonds*, 368 N.C. 906, 789 S.E.2d 1 (2016).  We directed the trial court to "apply a totality of the circumstances test" when rehearing the motion and to consider all factors, including "whether the involuntarily committed defendant 'was told that he was free to end the questioning.' "  *Id.* at 907-08, 789 S.E.2d at 2 (quoting *Howes v. Fields*, 565 U.S. 499, 517, 132 S. Ct. 1181, 1194, 182 L. Ed. 2d 17, 32 (2012)).

After taking additional evidence at a new suppression hearing, the trial court entered an order on 27 September 2016 that again denied defendant's motion to suppress.  As directed by this Court, the trial court made new findings of fact and conclusions of law in its order.  The matter is now back before this Court for review.

## II.  ANALYSIS

On appeal, in addition to challenging several of the trial court's findings of fact, defendant argues that the court's undisputed findings do not support its conclusions of law that (1) he was not in custody for purposes of *Miranda* during his 12 December 2012 interrogation, and (2) his statements to police during that interrogation were voluntary.

The standard of review in evaluating a trial court's "denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Jackson*, 368 N.C. 75, 78, 772 S.E.2d 847, 849 (2015) (quoting *State v. Otto*, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012)). "[T]he trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), *cert. denied*, 531 U.S. 1165, 121 S. Ct. 1126, 148 L. Ed. 2d 992 (2001)).

Conclusions of law are fully reviewable on appeal. *State v. Greene*, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992). "[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *Buchanan*, 353 N.C. at 336, 543 S.E.2d at 826 (alteration in original) (quoting *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000), *cert. denied*, 532 U.S. 931, 121 S. Ct. 1379, 149 L. Ed. 2d 305 (2001)). A trial court's determination

of whether an interrogation is conducted while a person is "in custody" for purposes of *Miranda* is a conclusion of law and thus fully reviewable by this Court. *Id.* at 336, 543 S.E.2d at 826.

For the reasons set forth below, we hold that the trial court's conclusion that defendant was not in custody for purposes of *Miranda* reflected an incorrect application of legal principles to the facts found by the trial court.[1]

In *Miranda* the United States Supreme Court recognized the "inherently compelling pressures" exerted upon an individual during an in-custody interrogation by law enforcement officers. 384 U.S. at 467, 86 S. Ct. at 1624, 16 L. Ed. 2d at 719. As a result, the Court prescribed procedural safeguards designed "to combat these pressures and to permit a full opportunity to exercise the [Fifth Amendment] privilege against self-incrimination." *Id.* at 467, 86 S. Ct. at 1624, 16 L. Ed. 2d at 719. These safeguards require that a defendant "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726.

---

[1] Defendant's challenges to the trial court's findings of fact are rendered moot by our holding that the court's denial of his motion to suppress must be reversed.

A *Miranda* warning is only required, however, when an individual is subjected to a "custodial interrogation." *Barden,* 356 N.C. at 337, 572 S.E.2d at 123 (citing, *inter alia, Miranda,* 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706). A "custodial interrogation" occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706. In determining whether an individual was subjected to a custodial interrogation, courts consider whether, "based on the totality of the circumstances, . . . there was a 'formal arrest or [a] restraint on freedom of movement of the degree associated with a formal arrest.' " *Buchanan,* 353 N.C. at 339, 543 S.E.2d at 828 (quoting *State v. Gaines,* 345 N.C. 647, 662, 483 S.E.2d 396, 405, *cert. denied,* 522 U.S. 900, 118 S. Ct. 248, 139 L. Ed. 2d 177 (1997)).

> Two discrete inquiries are essential to [this] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was [not] at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

*J.D.B. v. North Carolina,* 564 U.S. 261, 270, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310, 322 (2011) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383, 394 (1995) (brackets, internal quotation marks, and citations omitted)). Custody for *Miranda* purposes "depends on the objective circumstances of the

interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293, 298 (1994) (per curiam). That is, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 324, 114 S. Ct. at 1529, 128 L. Ed. 2d at 299 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317, 336 (1984)).

As the United States Supreme Court has recently clarified, however, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Fields*, 565 U.S. at 509, 132 S. Ct. at 1189, 182 L. Ed. 2d at 28. Rather, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id.* at 509, 132 S. Ct. at 1190, 182 L. Ed. 2d at 28 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 1224, 175 L. Ed. 2d 1045, 1058 (2010)).[2] Therefore, when a suspect's freedom of movement is already restricted because of conditions unrelated to the interrogation—such as civil commitment, criminal confinement, or hospitalization—reviewing courts must consider "all of the features of the interrogation" to determine "whether the relevant environment

---

[2] For example, "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*," *Fields*, 565 U.S. at 511, 132 S. Ct. at 1190, 182 L. Ed. 2d at 28-29, and "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody," *Shatzer*, 559 U.S. at 113, 130 S. Ct. at 1224, 175 L. Ed. 2d at 1058 (citation omitted).

presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 509, 514, 132 S. Ct. at 1190, 1192, 182 L. Ed. 2d at 28, 31.

Here, in its order issued upon rehearing defendant's motion to suppress, the trial court made the following finding of fact in which it recited circumstances it found to support its determination that defendant was not subjected to a custodial interrogation:

> Defendant was interviewed by two (2) detectives from the Monroe Police Department, they were in street clothes, asked permission to sit down (which was given by defendant), did not block the door; were in a room within the emergency department with a blaring loudspeaker and where conversations outside the room could be heard; that defendant was not handcuffed and was not restrained by law enforcement or the hospital, that the door to the room was glass and a sitter was assigned to observe the defendant, that the room had no bathroom, but the patient could walk to the door, open it and request personnel to accompany the patient to the bathroom (or make other requests of staff); that the interview was approximately 1 ½ (one and one half) hours in length (relatively short); that defendant was repeatedly told he was not under arrest and no warrants had been issued; that the conversation was calm and cordial in tone, that the detectives offered food or drink after the interview . . . .

The court also found, notably, the following facts:

> The officers . . . . never informed the defendant he could tell them to leave [and] never informed the defendant he could ask them to stop talking or he could stop talking to them and end the questioning.
>
> The officers did inform him that *as soon as he talked, they*

*could leave.*

(Emphasis added.)

Based upon its factual findings, the court explained that "after carefully weighing the totality of the circumstances, even the facts of defendant's involuntary commitment and the (very important) factor that defendant was never told he could end the questioning, this Court determines . . . that defendant was not in custody requiring Miranda Rights to be given." The court further concluded that "[a] reasonable person in defendant's position at the time of the interview would not have believed that he was in the custody of law enforcement." Accordingly, the court concluded, "The statements made by defendant were made when defendant was not in custody for purposes of the Miranda [rule]" and "[n]o Constitutional rights of defendant were violated."

In considering whether these conclusions resulted from a correct application of the law to the findings in this case, we focus on whether "a reasonable person" in defendant's situation would "have felt he . . . was [not] at liberty to terminate the interrogation," *J.D.B.*, 564 U.S. at 270, 131 S. Ct. at 2402, 180 L. Ed. 2d at 322 (quoting *Thompson*, 516 U.S. at 112, 116 S. Ct. at 465, 133 L. Ed. 2d at 394), and "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Fields*, 565 U.S. at 509, 132 S. Ct. at 1190, 182 L. Ed. 2d at 28.

The United States Supreme Court in *Howes v. Fields* also addressed a situation in which a defendant's freedom of movement was limited by circumstances not connected to the interrogation. There a prisoner was escorted by corrections officers from his cell to a conference room where two sheriff's deputies questioned him for between five and seven hours without reading him his *Miranda* rights. *Id.* at 502-04, 132 S. Ct. at 1185-86, 182 L. Ed. 2d at 23. The deputies' questions, which elicited incriminating statements, concerned criminal activity unrelated to the offense that had resulted in the suspect's incarceration.

In *Fields* the Court confronted the question of whether, for purposes of *Miranda*, the suspect was "in custody" when he was incarcerated and, consequently, was "not free to leave the conference room by himself." *Id.* at 515, 132 S. Ct. at 1193, 182 L. Ed. 2d at 31. The Court first made clear that "imprisonment *alone* is not enough to create a custodial situation within the meaning of *Miranda*[,]" *id.* at 511, 132 S. Ct. at 1190, 182 L. Ed. 2d at 28-29 (emphasis added), given that the "standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation," *id.* at 512, 132 S. Ct. at 1191, 182 L. Ed. 2d at 29. The Court held that rather than applying a *per se* rule in instances "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in

summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Id.* at 514, 132 S. Ct. at 1192, 182 L. Ed. 2d at 30-31 (citation omitted).

In conducting its totality-of-the-circumstances analysis, the Court determined that the following circumstances weighed in favor of concluding that the suspect was in custody under *Miranda*: (1) he neither invited the interview nor consented to it in advance; (2) he was not advised that he was free to decline the interview; (3) "[t]he interview lasted for between five and seven hours in the evening and continued well past" his typical bedtime; (4) the deputies who interviewed him were armed; and (5) "one of the deputies, according to [the suspect], '[u]sed a very sharp tone,' " and "on one occasion, profanity." *Id.* at 515, 132 S. Ct. at 1192-93, 182 L. Ed. 2d at 31.

The Court determined, on the other hand, that several circumstances weighed against a conclusion that the suspect had been subjected to a custodial interrogation: (1) he "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted"; (2) he "was not physically restrained or threatened"; (3) he "was interviewed in a well-lit, average-sized conference room, where he was 'not uncomfortable' "; (4) he "was offered food and water"; and (5) "the door to the conference room was sometimes left open." *Id.* at 515, 132 S. Ct. at 1193, 182 L. Ed. 2d at 31.

The Court ultimately concluded that, "[t]aking into account all of the circumstances of the questioning—*including especially the undisputed fact that [the*

*suspect] was told that he was free to end the questioning and to return to his cell*—we hold that [the suspect] was not in custody within the meaning of *Miranda.*" *Id.* at 517, 132 S. Ct. at 1194, 182 L. Ed. 2d at 32 (emphasis added).

Here defendant's freedom of movement was already severely restricted by the civil commitment order. Unlike in *Fields*, however, these officers failed to inform defendant that he was free to terminate the questioning and, more importantly, communicated to him that they would leave only after he spoke to them about the robbery. As noted above, the trial court made an undisputed finding that the officers told defendant that "as soon as he talked, they could leave." Specifically, the transcript of the interrogation reveals that before defendant's incriminating statements, Lieutenant Goforth told him:

> So let's think about Monday night again and what took place Monday evening, okay. All right. And then after we talk about this, we're going to get up and walk out and you can have your supper and you can watch some Christmas shows on TV and rest, okay. And we're going to go back to work and we're going to leave you alone.

We conclude that these statements, made to a suspect whose freedom is already severely restricted because of an involuntary commitment, would lead a reasonable person in this position to believe he was not "at liberty to terminate the interrogation" without first answering his interrogators' questions about his suspected criminal activity. *J.D.B.*, 564 U.S. at 270, 131 S. Ct. at 2402, 180 L. Ed. 2d at 322 (quoting *Thompson*, 516 U.S. at 112, 116 S. Ct. at 465, 133 L. Ed. 2d at 394).

We are mindful that "no single factor is necessarily controlling when we consider the totality of the circumstances." *Barden*, 356 N.C. at 338, 572 S.E.2d at 124 (citation omitted). After considering all of the relevant facts, we conclude that defendant was subjected to a custodial interrogation and thus was entitled to a *Miranda* warning. Accordingly, the trial court's order denying defendant's motion to suppress must be reversed because the trial court's conclusion to the contrary was an erroneous application of the law.

We also conclude that this error was prejudicial and therefore requires us to vacate defendant's conviction. "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443 (2015); *see also State v. Robinson*, 330 N.C. 1, 31, 409 S.E.2d 288, 305 (1991) ("Because the error is of constitutional dimension, the State bears the burden of demonstrating that it was harmless beyond a reasonable doubt." (citing *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990))). The State has not attempted to show that the constitutional error alleged by defendant—and found by this Court— was harmless beyond a reasonable doubt. Accordingly, the error is deemed prejudicial.[3]

---

[3] Because we hold that the trial court's erroneous conclusion that defendant was not entitled to a *Miranda* warning requires reversal of its suppression order, we need not

## III.  CONCLUSION

For the reasons stated above, we reverse the trial court's 27 September 2016 order denying defendant's motion to suppress the incriminating statements he made during his 12 December 2012 interrogation.  Because this error was prejudicial, we vacate defendant's conviction and remand this case to the superior court for further proceedings not inconsistent with this opinion.

JUDGMENT VACATED; REVERSED AND REMANDED.

Justice ERVIN dissenting.

Although the determination of whether defendant was "in custody" for *Miranda* purposes strikes me as an exceedingly close call in this case, I am forced to conclude, given that we are required to employ a "totality of the circumstances" analysis and are bound by the trial court's findings of fact, that defendant was not subjected to "custodial interrogation" when he made the unwarned inculpatory statements which he seeks to suppress.  As a result, I respectfully dissent from the Court's decision.

---

consider whether his statements should have been suppressed on the alternative ground that they were involuntary.

At approximately 8:46 p.m. on 10 December 2012, a group of men robbed Stephanie Gaddy of her purse while threatening her with a handgun. On 11 December 2012, between the hours of 12:45 p.m. and 1:05 p.m., defendant was transported by ambulance and hospitalized as the result of an intentional drug overdose. At about 3:50 p.m. on the same date, a magistrate entered an order involuntarily committing defendant based upon a finding that he was "mentally ill and dangerous to self or others." At 4:32 p.m., the Union County Sheriff's Office took defendant into custody pursuant to the magistrate's order. At about 5:11 p.m. on the following day, while still hospitalized pursuant to the involuntary commitment order, defendant was interrogated by officers of the Monroe Police Department for approximately one hour and twenty-eight minutes, during which time he made a number of inculpatory statements without ever having been advised of his *Miranda* rights.

In denying defendant's suppression motion, the trial court found, in pertinent part, that:

> 7) Jan Kinsella, nurse overseeing defendant at the time, gave permission for Detectives to speak with defendant. She informed them he was awake, conscious and alert and any medications given to defendant "should be out of his system by this time".

> 8) That defendant's room was located in the Emergency Department. The room had a solid door, with a full glass panel to the outside. This door was not locked during the interview.

9)     When the officers entered the room, defendant was in a hospital gown in his bed, and Detective Williams sat against the back wall. [Officer] T.J. Goforth sat at the foot of defendant's bed.

10)     There was no bathroom inside defendant's room. To leave the room, a patient must go to the door, open it and summon hospital personnel to accompany him or her. According to hospital records, defendant was ambulatory.

11)     The officers were dressed in street clothes, but with visible badges and carrying weapons. They did not identify themselves as members of the Monroe Police Department, but did give first names at some point.

12)     Before questioning, the officers asked permission to sit down, which was granted by defendant. Neither officer blocked the door.

13)     No law enforcement officer sat outside defendant's room.

14)     Outside the room was assigned a "sitter", a person charged to keep eyes on the defendant at all times, pursuant to his status as an involuntary commitment, although neither Defendant nor Officer Williams recalled seeing such at the time of the interview.

15)     The officers announced immediately that they were not there to arrest the defendant and they did not have warrants for his arrest. This statement was repeated in various ways throughout the interview. . . .

16)     The officers a) never informed the defendant he could leave. In fact, his involuntary commitment status, although civil in nature, effectively confined him to the hospital; b) never informed the defendant he could tell them to leave; and c) never informed the defendant he could ask them to stop talking or he could stop talking to them and end the questioning.

17)     The officers did inform him that as soon as he talked, they could leave.  The defendant was not in restraints or handcuffs; and was not arrested or served with warrants while at CMC-Union.

18)     The defendant was never threatened. . . .   The defendant was never isolated without the ability to contact others.

19)     The interview with defendant was tape recorded, without the knowledge of the defendant.  The tape is approximately one and one-half (1 ½) hours in length; about half of which concerned a theft at the defendant's workplace.  The defendant is questioned last about the armed robbery.

20)     In the background on the tape, an intercom blares loudly on several occasions.  At other times, conversations are heard other than the one between the officers and the defendant.  When questioned, Officer Williams describes the Emergency Room as "a very busy place".   The defendant never asked to stop the interview, never complained of pain or discomfort, never asked for a break, or for food, beverage, etc.

21)     The words spoken by both officers and defendant are conversational and cordial in tone.  No voices were raised.  The two officers' interrogation does not reveal a "good cop/bad cop" technique; more "very nice cop/nice cop" or at worse, "nice cop/(merely) pleasant cop".

22)     The officers do continue the interview until an admission is made; and confront the defendant when they seem to believe he was being less than truthful.  The interview is monotonic in tone. . . .

. . . .

58)     Defendant had been involuntarily committed as a result of an intentional overdose; he was not free to leave the hospital by virtue of this status; no Miranda rights

-19-

were given to defendant by law enforcement who were carrying badges and firearms. Defendant was never told he could ask law enforcement to stop questioning or to leave. Defendant had been administered medications in the late evening/early morning hours by physicians and had taken some amount of white pills late December 10, 2012 and early December 11, 2012; some of which may have remained in his system at the time of the interview.

59) Defendant was interviewed by two (2) detectives from the Monroe Police Department, they were in street clothes, asked permission to sit down (which was given by defendant), did not block the door; were in a room within the emergency department with a blaring loudspeaker and where conversations outside the room could be heard; that defendant was not handcuffed and was not restrained by law enforcement or the hospital, that the door to the room was glass and a sitter was assigned to observe the defendant, that the room had no bathroom, but the patient could walk to the door, open it and request personnel to accompany the patient to the bathroom (or make other requests of staff); that the interview was approximately 1 ½ (one and one half) hours in length (relatively short); that defendant was repeatedly told he was not under arrest and no warrants had been issued; that the conversation was calm and cordial in tone, that the detectives offered food or drink after the interview and promised nothing except to relay to the District Attorney the defendant's cooperation; that any residual drugs in his system were anti-anxiety or sleep-inducing; as described by the testifying experts; and seemingly lessening, in defendant's mind, the potential of coercion by officers; after carefully weighing the totality of the circumstances, even the facts of defendant's involuntary commitment and the (very important) factor that defendant was never told he could end the questioning, this Court determines by the preponderance of the evidence that the defendant was not coerced to give his statement on December 12, 2012; and the circumstances surrounding the defendant at the time and date in question show, considering the totality of the

circumstances, that defendant was not in custody requiring
Miranda Rights to be given.

In light of these findings of fact, the trial court concluded as a matter of law that "[a] reasonable person in defendant's position at the time of the interview would not have believed that he was in the custody of law enforcement" and that "[t]he statements made by defendant were made when defendant was not in custody for purposes of . . . Miranda." As a result, the trial court denied defendant's suppression motion.

According to well-established North Carolina law, the standard utilized in reviewing the "denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Jackson*, 368 N.C. 75, 78, 772 S.E.2d 847, 849 (2015) (quoting *State v. Otto*, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012)). "[T]he trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), *cert. denied*, 531 U.S. 1165, 121 S. Ct. 1126, 148 L. Ed. 2d 992 (2001)). "[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *Id*. at 336, 543 S.E.2d at 826 (alteration in original) (quoting *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000), *cert. denied*, 532 U.S. 931, 121 S. Ct. 1379, 149 L. Ed. 2d 305 (2001)).

"[T]he initial inquiry in determining whether *Miranda* warnings were required is whether an individual was 'in custody.' " *Id.* at 337, 543 S.E.2d at 826. In *Miranda*, the United States Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706 (1966). The extent to which a person is "in custody" for *Miranda*-related purposes depends upon "whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." *Buchanan*, 353 N.C. at 339-40, 543 S.E.2d at 828.

As the United States Supreme Court has recently stated, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," with the relevant test requiring the reviewing court to focus upon "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 1189-90, 182 L. Ed. 2d. 17, 27 (2012).

> In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is "cut off from his normal life and companions" and abruptly transported

from the street into a "police-dominated atmosphere" may feel coerced into answering questions.

By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change. . . . For a person serving a term of incarceration, . . . the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station.

*Id.* at 511, 132 S. Ct. at 1190-91, 182 L. Ed. 2d at 29 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 104-106, 113, 130 S. Ct. 1213, 1219-20, 1224, 175 L. Ed. 2d 1045, 1054 and *Miranda*, 384 U.S. at 456, 86 S. Ct. at 1618, 16 L. Ed. 2d at 713). As a result, a person who is already subject to restraint for some reason, such as imprisonment or service of an involuntary commitment order, is not automatically deemed to be "in custody" for *Miranda*-related purposes. Instead, the necessary restraint equivalent to that associated with a formal arrest must stem from factors that are extraneous to the existing restraint.

After carefully reviewing the trial court's findings of fact, I am satisfied that they support a conclusion that a "reasonable person in defendant's position" would not "have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." *Buchanan*, 353 N.C. at 339-40, 543 S.E.2d at 828. As the trial court found, (1) the officers spoke with defendant for approximately ninety minutes in a hospital; (2) on several occasions during the

interrogation, the officers clearly informed defendant that he was not under arrest, stating, among other things, that they did not possess warrants for defendant's arrest and "that they were not here to 'lock you up' "; (3) defendant was not handcuffed or formally placed under arrest prior to or during the interrogation; (4) nurses entered and left defendant's room during the interrogation; (5) defendant never lacked the ability to contact others during the interrogation; and (6), while the officers did press defendant on occasion, the interrogation was conducted in a conversational and even "monotonic" manner rather than in a confrontational tone.

As the Court notes, defendant was never asked if he wished to speak to the officers; the officers never told defendant that he could end the interrogation or ask the officers to leave; and the officers did tell defendant that, "after we talk about this, we're going to get up and walk out and you can have your supper and you can watch some Christmas shows on TV and rest, okay." Although these facts admittedly do, as my colleagues suggest, tend to cut in favor of a finding that defendant was "in custody" for *Miranda*-related purposes, I am not persuaded, in light of the totality of the circumstances, that they necessitate a finding to that effect, particularly given the fact that defendant was not isolated from civilian influences and the officers' repeated assurances that defendant was not under arrest and would not be placed under arrest during the time that he was being questioned. In fact, the officers' repeated assurance that defendant was not under arrest seems to me to be more directly relevant to the required "in custody" analysis than their failure to inform

defendant that he could end the interrogation whenever he chose to do so. Similarly, the officers' statement that they would leave once they finished "talk[ing] about this" with defendant does not, when taken in context, strike me as a threat that the conversation would continue until defendant confessed, given that such a "talk" could have concluded with a refusal on defendant's part to answer the officers' questions. When all the information reflected in the trial court's findings is considered as a unified whole and in light of the relevant legal standard, I am compelled to conclude that a reasonable person in the position in which defendant found himself would not believe that he was "under arrest or was restrained in his movement to the degree associated with a formal arrest." *Buchanan*, 353 N.C. at 339-40, 543 S.E.2d at 828. As a result, since the features of a "paradigmatic *Miranda* situation" are simply not present in this case, I respectfully dissent from my colleagues' determination that defendant's inculpatory statements were obtained in violation of *Miranda*.

CHIEF JUSTICE MARTIN and JUSTICE NEWBY join in this dissenting opinion.